**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

DEBRA FLEDDERMAN,                                   CASE NO.: 1:11-cv-530

        Plaintiff,                                   Judge Michael R. Barrett

    v.

DAIICHI SANKYO, INC.,

        Defendant.

## OPINION AND ORDER

    This matter is before the Court on Defendant Daiichi Sankyo, Inc.'s Motion for Summary Judgment.  (Doc. 16).  Plaintiff Debra Fledderman has filed an opposition (Doc. 21), and Defendant Daiichi Sankyo, Inc. has filed a reply (Doc. 35).  This matter is now ripe for review.

## I.    FACTUAL BACKGROUND

    While the facts in this case are extensive, the most relevant facts, as construed in favor of Plaintiff, are as follows:

### A.    Defendant

    Defendant is a corporation that maintains a portfolio of marketed pharmaceuticals for hypertension, hyperlipidemia, and bacterial infections and also focuses on the discovery of novel oncology therapies.  (Doc. 16-24 at #902-03).[1] Those pharmaceuticals include Azcor® and Benicar®, which are indicated for the treatment of hypertension, and Welchol®, which is indicated for the reduction of LDL

---

[1]Unless otherwise noted, all citations are to the Court's docket number and the respective PAGEID# provided by the CM/ECF system.

cholesterol. (*Id.*).  Defendant employs pharmaceutical sales representatives ("PSRs") who educate key physicians about Defendant's products and influence their prescription writing habits to increase Defendant's share in the market. (Doc. 29 at #1326; Doc. 29-1 at #1380-85).

      **B.**    **Plaintiff**

Plaintiff worked for sixteen years in customer service and sales for Forethought Financial Services, a provider of insurance and bank trusts marketed to funeral homes. (Doc. 29 at #1322-23).  In or about July 2007, Plaintiff was hired by Defendant as a Pharmaceutical Sales Representative ("PSR") for the Cincinnati West territory.  (*Id.* at #1324).  Throughout her employment, she was responsible for the marketing and promotion of Azcor®, Benicar® and Welchol® products.  (*Id.* at #1324-25).

When Plaintiff first began working for Defendant, her district manager was Andy Fedor.  (*Id.* at #1324, #1327-28).  Fedor left his role as district manager in or about June 2008.  (*Id.* at #1324).  In or about October 2008, Plaintiff began reporting directly to a new district manager, Jack Dugan ("Dugan"), who lived in Cincinnati, Ohio.  (Doc. 33 at #2317, 2320; Doc. 35-1 at #3168).  Her regional director was Joe Morgan, who was based out of Elgin, Illinois.  (Doc. 33 at #2307; Doc. 35-1 at #3168).  The Human Resources representative for the Midwest Region at the relevant times for this action was Lorraine Stoute who was based out of New Jersey.  (Doc. 35-1 at #3166).

Plaintiff also had multiple co-workers in the Cincinnati West territory.  One of those co-workers was Elizabeth Drews.  (Doc. 21-3 at #1059-60).  Drews, however, reported to a different manager than Plaintiff while Plaintiff was employed with

Defendant.  (*Id.* at #1061).  It was not until a year after Plaintiff's employment with Defendant ended that Drews began reporting to Dugan as her district manager.  (*Id.*)

###    C.    Evaluation of PSRs

As a PSR, Plaintiff was generally assessed under the Primary Care-Specialty Sales Rep Competency Model (the "Competency Model").  (Doc. 29 at #1350; Doc. 29-2 at #1469-73; *see also* Doc. 16-23 at #862-77).  The Competency Model identifies the following six core competencies:  (1) selling skills; (2) initiative and accountability; (3) product, disease state and market knowledge; (4) planning and resource management; (5) teamwork and relationship management; and (6) business administration.  (Doc. 16-23 at #862-77).  The Competency Model is the basic framework Defendant uses for its performance management process, including field coaching, annual performance evaluations and performance improvement plans. (Doc. 16-25 at #940-41).

Much of the PSR coaching occurs during ride-along sessions with the district manager.  (Doc. 35-1 at #2987).  The district manager provides verbal feedback as well as miniature performance evaluations known as the Field Contact Report ("FCR").  (*Id.*)  The FCRs track sales performance and reflect ratings given and coaching conducted by the district manager as to the PSR's competencies based upon the district manager's observations.   (Doc. 35-1 at #3174-75).   When a PSR receives more "needs development" ratings than "competent" or "highly proficient" ratings, her performance may be below expectations. (Doc. 35-1 at #3204).  However, the descriptor chosen by the district manager is based on his observations and is subjective.  (*Id.*)

Area and regional management for Defendant also sets specific performance expectations for their direct reports.  In 2009, the written Midwest Area Expectations

(the "Area Expectations") set the basic expectations for PSRs in the area, the additional area-wide goal to finish first in Year to Date ("YTD") rankings among all other PSRs, the expectation that each PSR in the area be ranked in the top half of the nation, and the expectation that PSRs learn and use Defendant's selling model as the foundation for developing sales competency.  (Doc. 32 at #2029-30; Doc. 32-1 at #2090-99).  While a failure to meet the sales expectations or goals does not mean that a PSR still could not meet expectations in her competencies, her performance of the competencies is supposed to be directly correlated to her sales numbers.  (Doc. 32 at #2026, #2029-30; Doc. 33 at #2364-65; Doc. 35-1 at #3203).  Plaintiff understood and agreed to the Area Expectations.  (Doc. 32-1 at #2999).

When coaching of a PSR is unsuccessful, Defendant has a process for administering progressive discipline.  (Doc. 16-22 at #813, #828-56).  The progressive discipline generally focuses on job performance and competencies rather than sales rank.  (*Id.* at #822).  The discipline process begins with a Warning Letter.  (*Id.* at #828-56).  Typically, an employee remains at the Warning Letter stage for up to 90 days.  (*Id.* at #811, #837).  If an employee does not progress, she may be immediately terminated if it is deemed appropriate.  (*Id.* at #833) ("DSI reserves the right to take immediate action as it deems appropriate and necessary[.]"); *see also* (Doc. 16-22 at #837) ("As a reminder, with HR approval, there may be earlier action [before the 90 day period expires] on either Warning[.]").  An employee also may be put on a Final Warning Letter if she is found not to have sufficiently improved during the Warning Letter period.  (Doc. 16-22 at #833).  The Final Warning Letter generally is in place for 90 days.  (*Id.* at #837).  Human Resources and senior sales management are involved in all stages of the

performance discipline process.  (Doc. 16-22 at #807).  Prior to the administration of Warning Letters or Final Warning Letters, Human Resources is supposed to consult with management and obtain performance documentation along with support for a planned performance discipline.  (*Id.* at #807, #834).

### D.    PSR Sales Rankings

As for keeping track of sales performance, Defendant uses YTD rankings, QTD rankings and Pulse Reports.  The sales rankings are calculated based on a mathematical formula using sales data from an outside company.  (Doc. 16-23 at #879-80).  When a PSR achieves certain QTD sales rankings, she is eligible for Incentive Compensation based on a target, annual programs, and additional product contests with varying timeframes.  (Doc. 16-10 at #482; Doc. 31 at #2730-31, #2747).  Similarly, eligibility for annual incentive programs is based on fiscal YTD performance.  (Doc. 16-10 at #483).  The primary annual program is the Platinum Performance cash award that is issued to PSRs with final YTD sales rankings in the top 66 of the nation.  (*Id.* at #483-84; Doc. 31 at #2728-30).  Qualification for the Gold Cup trip to Hawaii is issued to the top 10 percent of PSRs in the nation based on calendar YTD sales rankings.  (Doc. 16-10 at #484; Doc. 31 at #2729-30).  PSRs on a Final Warning are ineligible for participation in the Incentive Compensation Plan.  (Doc. 16-3 at #882-96; Doc. 31 at #2747-48; Doc. 35-1 at #3201).

As for Pulse Reports, they do not affect Incentive Compensation or eligibility for award programs.  (Doc. 31 at #2720, #2732, #2734).  Rather, they are preliminary reports based on part of the QTD ranking formula that fill in the several-month lag

period for finalized QTD reports.  (*Id.*)  The Pulse Reports contain the raw prescription numbers for the physicians in the PSRs district.  (*Id.*)

      **E.**    **Plaintiff's Employment History with Defendant**

While Fedor was acting as Plaintiff's district manager, he administered several FCRs and an annual review for Plaintiff.  In an October 15, 2007 FCR, Fedor rated Plaintiff in two areas: Pre-Call Planning and Engagement.  (Doc. 16-26 at #953).  In both areas, Plaintiff received a rating of Meets Expectations.  (*Id.*)  Fedor also commented that getting a commitment from Dr. X was exciting because he "is a well-respected Cardiologist in [Plaintiff's] territory" and that a very important part of Plaintiff's success would be practicing the sales message.  (*Id.* at #954-55).  In her February 2008 FCR, Fedor evaluated Plaintiff in the same two areas.  (*Id.* at #958-63).  While he did not provide a specific rating for those areas, his comments section indicated he would like to see her set more appointments and engage her doctors sooner in the tough access territory.  (*Id.* at #959).  He also noted that if Plaintiff was more confident in her sales message, then she would do a better job of engaging her doctors.  (*Id.* at #961).

At the end of fiscal year 2007, which ended March 31, 2008, Fedor administered Plaintiff's annual review.  (Doc. 16-3 at #212-26).  While her sales rank in Azcor® and Benicar® at the time were in the bottom of the rankings, she was in approximately the fiftieth percentile for sales rank in the Welchol® product and ranked fourth out of ten in the district for that product.  (*Id.* at #214).  Overall, she was ranked seventh out of ten in her district.  (*Id.* at #213).  As for her competencies, she was rated overall Competent in seven competencies, with a rating of Needs Development in only one of sixty-nine subcategories.  (*Id.* at #215-21).  That one Needs Development rating was in using

effective closing skills to gain action commitment, which fell under the Selling Skills competency.  (*Id.* at #216).  In the performance summary, the district manager noted, among other things, that Plaintiff needed to work on engaging doctors sooner in her sales call and holding them accountable to their commitments.  (*Id.* at #222).

In October 2008, Dugan took over as Plaintiff's district manager.  (Doc. 33 at #2320, #2317; Doc. 35-1 at #3168).  Morgan's handwritten notes dated December 12, 2008 indicate that Plaintiff was unhappy and that the West Cincinnati team was not a strong team and needed some "intervention."  (Doc. 16-24 at #905).

On or about December 22, 2008, Plaintiff received an FCR from Dugan.  (Doc. 16-4 at #228-31).  The FCR listed Plaintiff's YTD sales ranking as 451/500 with a QTD ranking of 446/500, and also indicated that her Azcor® share and her Welchol® volume had increased.  (*Id.* at #228).  As for skills ratings, Plaintiff was rated in two out of five areas, which were Pre-Call Planning and Needs-Based Solutions. (Doc. 16-4 at #228). In both areas, she received a rating of Meets Expectations. (*Id.*)  The FCR, however, contains "Additional Sales Calls Observations" wherein Plaintiff also was rated in A/B/W Messaging for which she received a rating of Needs Development as she did not effectively distinguish the Azor® patient from the Benicar® patient, and in MC Messaging/Closes for which she received a rating of Meets Expectations.  (*Id.* at #228).

On or about March 11, 2009, Plaintiff received a second FCR from Dugan.  (Doc. 16-4 at #232-36).  Her overall YTD sales ranking at the time was 458/500 while her QTD sales ranking was 253/500.  (*Id.* at #232).  Her Azcor® volume and Welchol® volume had both increased at that time.  (*Id.*)  As for skills ratings, Dugan again rated her in two of the five areas.  (*Id.*)  In Engagement, she received a rating of Needs

Development, and it was noted she did not consistently using grabbing openings, link to previous calls/commitments, or build relevance.  (*Id.*)  In Needs-Based Solutions, she received a rating of Meets Expectations.  (*Id.*)  As for the "Additional Sales Call Observations," she was rated as Meets Expectations for both A/B/W Messaging and MC Messaging/Closing.  (*Id.*)  Although Morgan testified that he and Dugan had conversations about putting Plaintiff on a Warning Letter as early as March 2009, his subsequent testimony indicates that he cannot recall exactly when those conversations occurred.  (Doc. 33 at #2317-19).

According to Plaintiff, she received several text messages from Dr. X on or around March 31, 2009.  (Doc. 23-1 at #1167).  One of the text messages indicated he "made sure that [Plaintiff] and Michelle are not going to be pulled out from me[.]  He did say if I called on Xenia[,] Blanch[e]ster, [W]imin[g]ton[,] then he can have the other rep get me in the game[.]  I told him I am fine and would discuss it with u [sic]."  (*Id.*)

On or about April 23, 2009, Plaintiff received a third FCR from Dugan.  (Doc. 16-4 at #237-41),  On the FCR, Plaintiff's YTD sales rank was listed as 469/500, her QTD sales rank was listed as 425/500, and it was noted that her Azcor® sales volume had improved.  (*Id.*)  Dugan again rated her in two of five areas for that FCR.  (*Id.* at #237).  In the first area of Engagement, Plaintiff received a rating of Needs Development and it was noted she had trouble with her openings.  (*Id.*)  In the second area of Needs-Based Solutions, Plaintiff also received a rating of Needs Development, and she was criticized for not detailing certain rates and for confusing the customer.  (*Id.*)  However, under "Additional Sales Call Observations," Dugan rated her M/C Messaging/Closing as Meets Expectations.  (*Id.* at #238).

On or about May 13, 2009, Plaintiff met with Dugan for a review of her performance for fiscal year 2008, which ended March 31, 2009. (Doc. 29 at #1337; *see also* Doc. 16-8 at #368-82). For that fiscal year, Plaintiff's overall rating was at or near the bottom for the nation, region and district. (*Id.* at #369). However, with respect to the Welchol® product, she had ranked in the top third, or better, for the nation, region and district. (*Id.* at #370). As for her competencies, she was rated overall Competent in four of the competencies (Selling Skills; Product, Disease State and Marketplace Knowledge; Administration and Organization; and Compliance) and rated overall Needs Development in three of the competencies (Initiative and Accountability; Planning and Resource Management; and Teamwork and Relationship Management). (*Id.* at #371-77). She also received Needs Development ratings in six of the ten sub-categories for Initiative and Accountability, two of the eleven sub-categories for Selling Skills, three of the twelve sub-categories for Planning and Resource Management, and four of the ten sub-categories for Teamwork and Relationship Management. (*Id.*) In the performance summary, Dugan noted, among other things, that Plaintiff needed to work on engaging customers, and to take initiative to capitalize on opportunities to overcome obstacles in her territory. (*Id.* at 222). He also noted that Defendant was "depending on these key UHC customers to drive our growth for your entire territory" and that "[f]or this to happen, [Plaintiff] need[ed] more customers with growth like" Dr. X. (Doc. 16-8 at #378); *see also* (Doc. 32 at #2041-42). At the time of the review, Plaintiff informed Dugan of the sexual harassment by Dr. X, one of her highest prescription writers, but said that she was going to try to handle the issue on her own and would report it if it was out of control. (Doc. 16-8 at #378; Doc. 29 at #1331, #1337; Doc. 32 at #2041).

On June 25 and June 29, 2009, Plaintiff received a fourth FCR from Dugan. (Doc. 16-4 at #242).  The FCR listed her YTD sales ranking as 386/500 while her QTD sales ranking was 157/500 with an improvement in both Azcor® and Benicar®.  (*Id.*) Out of the five areas listed, Plaintiff was rated in three.  (*Id.*)  In all three of those areas, she received ratings of Needs Development.  (*Id.*)  Specifically, in Engagement she was criticized for not detailing the core selling message, in Needs-Based Solutions she was criticized for not presenting information for two of the products, and in Gaining Commitment she was criticized for not asking a question to gain commitment and for not using a closing statement.  (*Id.*)  Under "Additional Sales Call Observations," Dugan noted that Plaintiff was Meeting Expectations in M/C Messaging/Closes.  (*Id.* at #243).

On July 16, 2009, Plaintiff, on behalf of herself and a co-worker, Elizabeth Drews, "officially" reported concerns to Dugan regarding Dr. X's harassment. (Doc. 29 at #1337).  According to Plaintiff, Dugan responded by asking "are you sure you want to do this?  It's going to impact your territory.  You know you are going to have to replace that business."  (*Id.*)  Dugan, however, denies making those statements, indicating that he gave Plaintiff his full support with respect to her decision to report Dr. X.  (Doc. 32 at #2062). Dr. X was not removed from Plaintiff's call plan until approximately January 2010.  (Doc. 23-1 at #1170).  Drews, however, testified that her manager, Mr. Nelson, supported her report of harassment.  (Doc. 21-3 at #1061).  She further testified that Dr. X wrote a large number of prescriptions, and her ranks dropped after she stopped calling on him.  (*Id.*)

On July 30, 2009, Dugan called Stoute asking to place Plaintiff on a Warning Letter, and sent a follow-up email to Stoute stating, "I believe some type of formal action

is necessary." (Doc. 23-1 at #1151; Doc. 35-1 at #3188).  According to Stoute, this was when she had become aware of Plaintiff's performance issues.  (Doc. 35-1 at #3188). Nevertheless, Dugan testified that he did not suggest putting Plaintiff on a performance plan until after he had administered another FCR for Plaintiff.  (Doc. 32 at #2056-57).

On August 1, 2009, Morgan had a conversation with Dugan about the sexual harassment by Dr. X, which was immediately followed by a conversation about the need to push a warning for Plaintiff.  (Doc. 16-24 at #910).  Both Morgan and Stoute were thereafter involved in the performance discipline of Plaintiff; however, neither of them ever personally observed Plaintiff's performance in the field.  (Doc. 16-22 at #807; Doc. 35-1 at #3168, #3179).

On August 13, 2009, Dugan administered a fifth FCR for Plaintiff.  (Doc. 16-4 at #247-52).  Dugan told Plaintiff that before he gave her the FCR, he had to speak with Morgan.  (Doc. 29 at #1324).  Dugan never before had indicated to her that he needed to talk to Morgan about an FCR.  (*Id.* at #1355; Doc. 16-4 at #247-52).  On the FCR, her YTD ranking was listed as 422/500 and her QTD rating was listed as 201/500.  (*Id.*)  As for her skills ratings, Dugan evaluated her in two areas:  Engagement and Gaining Commitment.  (*Id.* at #247-48).  In both areas, Dugan gave her a rating of Needs Development. (*Id.*)  In "Additional Sales Call Observations," she also received Needs Development ratings in Resource Planning Utilization and Prod./Comp./Mkt. Knowledge.  (*Id.* at #249).  Dugan noted this was the fourth consecutive field visit on which she failed to meet expectations in demonstrating effective engagement, and the second consecutive FCR where she did not meet expectations in gaining commitments. (*Id.* at #249-50).  Following that FCR, Plaintiff wrote an email to Dugan, expressing her

concerns about his evaluations not reflecting the progress she believed she was making.  (Doc. 16-5 at #280-81).  She also noted the "situation that happened in July" and the concern Dugan expressed about how it would impact her territory, as he asked her several times "'are sure you want to do this?'"  (*Id.* at #280).  After meeting with Plaintiff about the issue, Dugan prepared an email that he sent to Morgan in which he wrote that he and Plaintiff agreed that his actions and the actions of Defendant "indicate full support of [Plaintiff's] decision not to call on Dr. [X]."  (Doc. 21-1 at #1044-45; Doc. 32-1 at #2166).  According to Plaintiff, she reached no such agreement with Dugan or the company.  (Doc. 21-1 at #1045).

On September 10, 2009, Morgan noted that Plaintiff was "about to go on warning letter," and on September 24, 2009, she received that Warning Letter.  (Doc. 16-24 at #911-12; Doc. 16-5 at #283).  The areas noted on the Warning Letter included engagement with physicians, gaining commitment, needs-based solutions, promotional budget, capitalizing on opportunities and overcoming obstacles.  (Doc. 16-5 at #284-87).  Following the identification of the purported problem areas along with the action plan, the Warning Letter provided: "This letter serves as formal warning regarding the above stated responsibilities and you will have up to 90 days to comply with all the action items contained in this letter.  Failure to demonstrate immediate and sustained improvement on an on-going basis may result in further disciplinary action up to and including termination."  (*Id.* at #288).  However, there was no specific criteria set forth for measuring success in many, or all, of these areas.  (Doc. 32 at #2071, #2078; Doc. 33 at #2359, #2363; Doc. 35-1 at #3212).

Between October 2009 and November 2009, Plaintiff received multiple emails from Dugan updating her on her progress, or lack thereof.  (Doc 16-9 at #398-404).  In those emails, Dugan noted that she was not meeting expectations on all of the Warning Letter areas, except that by October 29, 2009, he had noted that Plaintiff was developing in the area of Engagement.  (*Id.*)

On October 20, 2009, Dugan provided a sixth FCR to Plaintiff.  (Doc. 16-4 at #253-56).  At that time, she had a YTD ranking was 432/500, a QTD ranking of 466/500, and she had increased sales in the Azcor® and Benicar® markets.  (*Id.* at #253).  On the FCR, she was rated in and received a Not Progressing rating in three core competencies:  Selling Skills, Planning and Resource Management, and Initiative and Accountability. (*Id.* at #253-54).  Under the Selling Skills competency, she received ratings of Learning-Developing for Engagement/Probing and Clinical Messaging, and of Not Progressing for POA Messaging and Gaining Commitment.  (*Id.* at #253).  She received no ratings in three other subcategories under Selling Skills.  (*Id.*)  Under the Planning and Resource Management competency, she received a rating in only one subcategory, which was a Not Progressing rating for Promo Budget Utilization.  (*Id.* at #254).  As for the Initiative and Accountability, Plaintiff received a rating in only of the five subcategories, which was a Not Progressing rating for Seizes Opportunities.  (*Id.*)

On November 17, 2009, Dugan administered another FCR for Plaintiff.  (Doc. 16-4 at #257-60).  At the time, Plaintiff's YTD and QTD rankings were near the bottom.  (*Id.* at 257).  Plaintiff again was rated in three core competencies, in which she received a Learning-Developing rating in Selling Skills, and Not Progressing ratings in Planning and Resource Management and Initiative and Accountability.  (*Id.* at #257-58).  For the

Selling Skills subcategories, she also received ratings of Learning-Developing for Engagement/Probing and Gaining Commitment, and Not Progressing for POA Messaging.  (*Id.* at #257).  She received no ratings in three other subcategories.  (*Id.*)  As for the six subcategories of Planning and Resource Management, she received only one rating – a Not Progressing in Promo Budget Utilization.  (*Id.* at #254).  Similarly, for the five subcategories of Initiative and Accountability, Plaintiff received a rating in only one – a Not Progressing for Seizes Opportunities.  (*Id.*)

By letter dated December 1, 2009, Plaintiff received a 60-day update to her Warning Letter.  (Doc. 16-8 at #392).  The update letter indicated that Plaintiff had shown improvement in Engagement, Gaining Commitment, and some aspects of Needs-Based Solutions although she still was below expectations in that area.  (*Id.* at 394).  She also was informed that she did not effectively leverage field cash and was "below expectations" in that area; she did not conduct the programs to assist in promotional efforts, which represented a missed opportunity; she had not demonstrated significant progress in capitalizing on key managed care opportunities; and she did not improve access to the customers identified.  (*Id.* at #395-96).  The update letter further noted that the examples within her action plans and her execution remained "below expectations."  (*Id.* at #394-96).

On January 14, 2010, Plaintiff received a Final Warning in which she was informed that she remained below expectations on her overall sales performance as well as the specific core competencies described in her Warning Letter, including Selling Skills, Planning and Resource Management, and Initiative and Accountability.

14

(*Id.* at #426-30).  Like the Warning Letter, the Final Warning Letter set up an Action Plan for each category.  (*Id.*)  The Final Warning Letter concluded with the following:

> [B]ecause of your failure to comply with the action items above you are not on probation for a period of up to 90 days.  All action items will continue until the level of competency is achieved.  I will be reviewing your performance regularly and if at any point you do not achieve both immediate and sustained improvement it will lead to disciplinary action up to an including termination.  Please be informed that if substantial improvement is made, it must be sustained not only within the probationary period but also well past it or termination will ensue.

(*Id.* at #430).  After receiving her Final Warning, Plaintiff sent an email to Stoute detailing her concerns about Dugan's assessment.  (Doc. 16-27 at #980-82).  Stoute responded by letter to Plaintiff's email, noting that she found no evidence to support Plaintiff's statement that her performance assessment negatively changed after she reported harassment by Dr. X and that it was unnecessary to grant her request for a FCR assessment by another manager. (*Id.* at #984).

On February 4, 2010, Dugan administered another FCR for Plaintiff.  (Doc. 16-4 at #261-65).  While her YTD and QTD sales rankings had improved, she still fell near the bottom in those rankings.  (*Id.* at 261).  For this FCR, Plaintiff did not receive any overall ratings in any of the core competencies.  (*Id.* at #261-62).  Instead, she received only the following ratings in the subcategories:  Not Progressing in Engagement/Probing, Promo Budget Utilization, and Seizing Opportunities, and Learning-Developing in POA Messaging and Gaining Commitment.  (*Id.*)

On March 11, 2010, Dugan administered Plaintiff's final FCR.  (*Id.* at #266-69).  On this FCR, Plaintiff received the following ratings:  on Selling Skills, she was Not Progressing on Probing, Gaining Commitment/Closing, Sales Call Messaging, and was Learning-Developing  on  Pre-Call  Planning/Post-Call  Analysis;  on  Initiative  and

Accountability, she was Not Progressing on Seizing Opportunities; and on Planning and Resource Management, she was Not Progressing on Field Cash and Promo Budget Utilization.  (*Id.* at #267-69).

On March 19, 2010, Plaintiff received an update to her Final Warning.  (Doc. 16-9 at #432-38).  Dugan indicated that she remained "below expectations" in Engagement, Gaining Commitment, Needs Based Solutions, Field Cash and SCS Funds, as she had not progressed since the beginning of her Final Warning period. (*Id.* at 435-36).  While he noted that she submitted her Planning and Resource Action Plan on time, her execution and results remained below expectations.  (*Id.* at #436).  However, during the first quarter of 2010, Plaintiff won the Fast Start contest for the region, which Stoute testified was a positive indicator of performance even though it was not specific to her skill development.  (Doc. 35-1 at #3201).

On April 15, 2010, Plaintiff was terminated by Defendant.  (Doc. 29 at #1365).

Approximately one year after Plaintiff's termination, Drews began reporting to Dugan.  (Doc. 21-3 at #1058-59).  Drews contends that Dugan immediately began issuing negative reviews to her.  (*Id.*)  According to Drews, she believed Dugan was retaliating against her, and thus, she resigned from Defendant and secured another position elsewhere.  (*Id.* at #1059).

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" only if its resolution affects the outcome of the suit. *Id.*

On summary judgment, a court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party has the burden of showing an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

Once the moving party has met its burden of production, the non-moving party cannot rest on his pleadings, but must present significant probative evidence in support of his complaint to defeat the motion for summary judgment. *Anderson*, 477 U.S. at 248–49. "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Id.* at 252. Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## III.   ANALYSIS

Plaintiff brings claims for retaliation under Title VII, 42 U.S.C. 2000(e), *et seq.*, and Ohio Revised Code § 4112.02 as enforced through Ohio Revised Code § 4112.99. (Doc. 1). Claims brought under Title VII and Chapter 4112 are evaluated under the same standard. *Thompson v. UHHS Richmond Heights Hosp., Inc.*, 372 Fed. App'x 620, 623 (6th Cir. 2010); *Staunch v. Cont'l Airlines, Inc.*, 511 F.3d 625, 631 (6th Cir.

2008) (citing *Plumbers & Steamfitters Joint Apprenticeship Comm'n v. Ohio Civil Rights Comm'n*, 66 Ohio St. 2d 192, 421 N.E.2d 128, 131 (Ohio 1981)).

To set forth an actionable claim for retaliation, a plaintiff is "required to either 'present direct evidence of discrimination or introduce circumstantial evidence that would allow an inference of discriminatory treatment.'" *Carter v. Univ. of Toledo*, 349 F.3d 269, 272 (6th Cir. 2003). Here, Plaintiff has not presented, nor has she argued that she has presented, direct evidence of retaliation. (*See* Doc. 21). Accordingly, the Court will consider only whether Plaintiff has presented sufficient circumstantial evidence of retaliation to survive summary judgment.

To prove a *prima facie* case of retaliation, Plaintiff must show: (1) she engaged in protected activity, (2) Defendant was aware of the protected activity, (3) Defendant subsequently took an employment action adverse to Plaintiff, and (4) a causal connection exists between the protected activity and the adverse employment actions. *Abbott v. Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir. 2003) (citing *Strouss v. Michigan Dep't of Corr.*, 250 F.3d 336, 342 (6th Cir. 2001); *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000)). If Plaintiff can establish a *prima facie* case, then "the burden shifts to [Defendant] 'to articulate some legitimate, nondiscriminatory reason'" for its conduct. *Id.* (citing *Nguyen*, 229 F.3d at 562). Finally, if Defendant articulates such a reason, the burden shifts back to Plaintiff to present evidence that the non-discriminatory reason offered by Defendant was merely a pretext for discrimination. *Id.*

Here, the parties dispute three issues: (1) the adverse actions to which Plaintiff was subjected by Defendant; (2) whether a causal connection exists between the

18

protected activity and the adverse action; and (3) whether Plaintiff has proven pretext. The Court will address each issue separately below.

### A.   **Adverse Actions**

The parties do not dispute that Plaintiff suffered an adverse action when she was subjected to a Final Warning or when she was terminated.  (*See* Doc. 35 at #2900-03). Instead, Defendant contends that the July 30, 2009 request to initiate the Warning Letter, the August 13, 2009 FCR, and the September 24, 2009 Warning Letter cannot be considered adverse actions because they did not constitute material changes in employment conditions.  Plaintiff, however, insists that the incidents that preceded her Final Warning and eventual termination must also be considered.

Not every act affecting an individual's employment can be considered an adverse, retaliatory action giving rise to liability.  *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998) (noting need for tangible employment action to support vicarious liability discrimination).  Instead, to support a Title VII claim, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S. Ct. 2405, 2415, 165 L. Ed. 2d 345 (2006) (internal quotation omitted).  In determining whether an employee's change is material, the Court must consider the context of the action.  *Id.* Regarding context the Supreme Court stated:

> We phrase the standard in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters. The real social impact of workplace behavior often depends on a constellation of surrounding

circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school age children.  A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination.

*Id.* at 2415-16 (internal quotations and citations omitted).  The burden to establish a *prima facie* case in a retaliation action is not onerous.  *Abbott*, 348 F.3d at 542.

Under this standard, a markedly lower performance evaluation score that significantly impacts an employee's wages or professional advancement may be considered materially adverse. *McBroom v. Barnes & Noble Booksellers, Inc.*, 747 F. Supp. 2d 906, 916-918 (N.D. Ohio 2010) (citing *Halfcre v. Home Depot, U.S.A., Inc.*, 221 Fed. App'x 424, 433 (6th Cir. 2007); *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 403 (6th Cir. 2008); *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 322 (6th Cir. 2007); *James v. Metro. Gov't of Nashville*, 243 Fed. App'x 74 (6th Cir. 2007)).  *But see Novotny v. Reed Elsevier*, 291 Fed. Appx. 698, 703 (6th Cir. 2008) (applying pre-Burlington authority to find that providing greater scrutiny of an employee's calendar, requiring the employee to submit self-evaluations earlier than her co-workers, and placing her on a performance plan did not constitute adverse actions).

Courts also have considered poor performance appraisals that form the basis of an eventual dismissal to be materially adverse. *See, e.g., Tuttle*, 474 F.3d at 323 ("[D]istrict court could have found that the unfavorable job performance appraisals . . . likely resulted in both [plaintiff's] transfer . . . and, later on, her termination from employment."); *Bacon v. Honda of Am. Mfg., Inc.*, 192 Fed. App'x 337, 344 (6th Cir.

20

2006) (negative evaluations that are used to support a discharge can be considered adverse employment actions); *Keys v. Humana, Inc.*, No. 3:09-cv-834-S, 2010 U.S. Dist. LEXIS 75096, at *8 (W.D. Ky. July 23, 2010) (in a discrimination case under Title VII, a properly supported allegation that downgraded evaluation eventually resulted in discharge was sufficient to make out an adverse action); *Reitz v. City of Mt. Juliet*, No. 3:08-cv-0728, 2009 U.S. Dist. LEXIS 118170, at *20 (M.D. Tenn. Dec. 18, 2009) ("reprimands led directly to Reitz's suspension . . . and to her eventual termination," and a reasonable employee might well have "been dissuaded from reporting harassment if she knows that her supervisor will impede her job performance, resulting in frequent and unfair reprimands"). Likewise, putting an employee on a performance plan may be considered materially adverse in the retaliation context. *Michael v. Caterpillar*, 496 F.3d 584, 596 (6th Cir. 2007) (finding that "[t]he retaliatory actions alleged by [the plaintiff], including . . . the 90-day performance plan, appear to meet this relatively low bar [for an adverse action]").[2]

However, a downgraded performance appraisal has been found not to constitute an adverse action where the performance of the plaintiff, even though downgraded, still is satisfactory, or where the appraisal does not result in termination based on that appraisal. *See, e.g., Jones v. St. Judge Medical S.C., Inc.*, 823 F. Supp. 2d 699, 727-28 (S.D. Ohio 2011) (downgraded performance evaluation was not an adverse action where it did not affect wages or salary since the plaintiff did not establish that the performance review was used in deciding not to assign an account to her or when selecting her for a reduction in force); *Hollins v. Atlantic Co., Inc.*, 188 F.3d 652, 662

---

[2]Although Defendant argues that the *Michael* court expressed "significant doubt" about whether a performance plan was materially adverse, the court expressed such doubt in the context of a discrimination claim rather than the retaliation claim. *See Michael*, 496 F.3d at 595.

(6th Cir. 1999) (where the plaintiff received "only slightly lower ratings" on two out of seventeen possible factors and never received an unfavorable evaluation, the lowered performance ratings coupled with a merit raise did not constitute a materially adverse change in terms and conditions of employment); *Allen v. Ohio Dep't of Job & Family Servs.*, 697 F. Supp. 2d 854, 889-90 (S.D. Ohio 2010) (where plaintiff was rated "below target" in several areas, "above target" in other areas, given an overall evaluation of satisfactory, and one unsatisfactory evaluation, the court found that the lowered performance evaluations did not constitute adverse actions because plaintiff did not show that he would have been awarded the promotion but for those evaluations).

Here, Plaintiff has not come forward with evidence that shows that the July 30, 2009 request to initiate the warning letter constituted an adverse action. While it is an act that may be considered in evaluating causation, the Court does not find that the request rose to the level of an adverse employment action. A request to initiate a Warning Letter may or may not be granted. If it is not granted, then there is no change in employment conditions. If it is granted, then the adverse action that results could be the Warning Letter itself. Plaintiff has set forth no evidence that suggests her employment conditions changed as a result of the request for a Warning Letter alone or that the request for a Warning Letter was relied upon in her eventual termination. Rather, it was the August 13, 2009 FCR, the Warning Letter and the Final Warning that formed the basis of her eventual termination. Moreover, Plaintiff has presented no evidence that she even was aware of the request to put her on a Warning Letter. Considering that lack of evidence, the Court concludes that a reasonable employee

would not have been dissuaded from reporting harassment as a result of Dugan's request to put Plaintiff on a Warning Letter.

Nevertheless, Plaintiff has presented sufficient evidence that construed in her favor shows the poor performance appraisal on August 13, 2009 and her Warning Letter issued on September 24, 2009 formed the basis for two actions that undisputedly were materially adverse – her Final Warning and her eventual termination.  As to the August 13, 2009 FCR, there is evidence that this performance appraisal was administered to obtain sufficient documentation of negative evaluations prior to putting Plaintiff on a Warning Letter, which when construed in favor of Plaintiff suggests that such sufficient evaluations did not exist until that time.  Further, when the evidence is construed in favor of Plaintiff, the August 13, 2009 FCR downgraded Plaintiff's performance from prior reviews in that she was given more ratings of Needs Development than she had ever previously received on a single FCR.  Moreover, for the first time ever, Dugan escalated that FCR to the regional manager, which made the FCR more significant to Plaintiff's employment conditions.  That FCR then resulted in a Warning Letter, which led to the undisputed adverse action of a Final Warning Letter, which eventually led to the undisputed adverse action of termination.  Construing this evidence in favor of Plaintiff, the inference is that it could have affected her performance achievement and was used as a basis for ultimately terminating her.  As such, it constituted an adverse action under the not onerous standard.

As for the September 24, 2009 Warning Letter, it proscribed a formal action plan with which Plaintiff had to abide in order to be taken off a warning.  The number of requirements she was asked to satisfy, without any specific criteria for satisfying them,

suggest that her duties became more arduous, which could have discouraged reports of discrimination. Moreover, as noted above, being placed on a performance plan is sufficient to meet the relatively low bar for adverse actions in the retaliation context. *See Michael*, 496 F.3d at 596. Nevertheless, Plaintiff was subject to more than just a performance plan when she was placed on the Warning Letter. The Warning Letter stated that a "failure to improve would result in further discipline up to and including termination" (Doc. 16-5 at #288), which demonstrates that Plaintiff's future performance incentives and her employment with Defendant were on thin ice, or in jeopardy. Indeed, Defendant's internal documents regarding warning letters state that termination could occur immediately without resort to further warnings. (Doc. 16-22 at #833). A reasonable employee subject to such a warning therefore could be dissuaded from reporting discrimination to management. Although there is no requirement that termination be "imminent" for there to be an adverse action, as suggested by Defendant, even if there were such a requirement, the facts construed in Plaintiff's favor indicate that Plaintiff's termination could have been "imminent" had Dugan chosen to immediately terminate her without resort to a final warning and without further notice. Finally, there is no dispute that the Warning Letter, and Plaintiff's alleged failure to meet the requirements set forth in the Warning Letter's action plan, led to the Final Warning, which is an undisputed adverse action, and her eventual termination, which also is an undisputed adverse action. For each of those reasons, the Warning Letter satisfies the relatively low standards for a *prima facie* case in the context of retaliation.

Although Defendant argues that Plaintiff could not have been dissuaded from engaging in protected activity because Dugan told Plaintiff he supported her decision,

there are other facts that when construed in favor of Plaintiff suggest that Dugan may not have supported her decision. For example, the statement "are you sure you want to do this?" when construed in favor of Plaintiff shows a lack of support of her protected activity. As such, whether Dugan did or did not support Plaintiff's protected activity requires a credibility determination that is not appropriately made at the summary judgment stage.

Further, Defendant's suggestion that the Court should be persuaded by Plaintiff's complaints of retaliation is not well taken. (See Doc. 35 at #2904) (stating that Plaintiff was "far from being dissuaded by the constructive criticism she received" because she "confronted Dugan and Morgan repeatedly about her performance and did not hesitate to complain to Stoute about perceived retaliation and unfairness"). Whether Plaintiff was herself dissuaded from engaging in protected activity is not the standard. Instead, the "standard for judging harm must be objective." *Burlington Northern*, 126 S.Ct. at 2415 (emphasis added). An objective standard "avoids the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings." *Id.* Thus, in reaching the conclusion that the at-issue FCR and Warning Letter are adverse actions, the Court has relied on such an objective standard.

**B.** **Causation**

Defendant also contends that Plaintiff has failed to establish a causal link between her complaint to Dugan about harassment by Dr. X and her adverse actions. "To establish the element of causation in a retaliation claim, a plaintiff 'is required to proffer evidence sufficient to raise the inference that his protected activity was the likely reason for the adverse action.'" *St. Jude*, 823 F. Supp. 2d at 746 (quoting *EEOC v.*

25

*Avery Denison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997)).  "'[A]t the *prima facie* stage, the burden is minimal, requiring the plaintiff to put forth some evidence to deduce a causal connection between the retaliatory action and the protected activity and requiring the court to draw reasonable inferences from the evidence, providing it is credible." *Id.* (quoting *Avery Denison Corp.*, 104 F.3d at 861).  "'Although no one factor is dispositive in establishing a causal connection . . . evidence that defendant treated the plaintiff differently than similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation.'"  *Id.* (quoting *Nguyen*, 229 F.3d at 563).

Defendant contends that Plaintiff has failed to set forth sufficient evidence of similarly situated individuals who were treated differently than Plaintiff or of temporal proximity.

### 1.  <u>Similarly Situated</u>

One way in which Plaintiff can demonstrate causation is by showing that similarly situated individuals were treated differently.  Although it is not required that Plaintiff demonstrate an exact correlation between herself and others similarly situated who received more favorable treatment, she must show that the proposed comparators are similar in all relevant respects.  *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 751 (6th Cir. 2012) (citing *Clayton v. Meijer, Inc.*, 281 F.3d 605, 611 (6th Cir. 2002)).  In the disciplinary context, the Sixth Circuit has held that to be found similarly situated, the plaintiff and her proposed comparator must have "engaged in acts of 'comparable seriousness."  *Id.* (citing *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 710 (6th Cir. 2006)).  To make this assessment, a court must look "to certain factors, such as

whether the individuals 'have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'"  *Wright*, 455 F.3d at 710 (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)).  The Court finds that Plaintiff has not met this burden.

Plaintiff argues that Stephanie Lamp and Christine Corvo are comparators.  She contends that both Lamp and Corvo had lower *sales* rankings than Plaintiff in the 2009 fiscal year and that with respect to Pulse Reports and QTD rankings she was doing better than her peers when she was on her Warning and/or Final Warning.  The flaw in Plaintiff's argument, however, is that the Warnings/Final Warnings primarily were based on her core competencies rather than her sales rankings, or at least were a combination of the two factors.  Plaintiff has set forth no evidence that either Lamp or Corvo acted in the same or similar manner as she did with respect to core competencies but received ratings on FCRs that were higher than her or were not placed on or subjected to a Warning Letter, Final Warning or termination when they performed in the same manner on those core competencies as Plaintiff.

As for Elizabeth Drews, she also is an insufficient comparator because the evidence does not show Drews was similar to Plaintiff in all relevant respects.  Drews allegedly participated in the same protected activity as Plaintiff, as she complained about harassment by Dr. X.  Although Drews was not terminated or subject to disciplinary warnings around the time she complained, she was at that time under different management than Plaintiff.  Further, there is no evidence that Drews performed

her core competencies in a manner similar to Plaintiff but was rated differently on her performance.  Although it is notable that when Drews later was placed under the management of Dugan, she felt she was being retaliated against by Dugan because of her protected activity and therefore voluntarily resigned, that is not enough to make her a proper comparator for the purposes of Plaintiff's retaliation claim.   As such, Plaintiff has not established causation by comparing herself to another who was similarly situated but treated differently.

### 2.   **Temporal proximity**

A second way a plaintiff may prove causation is by showing temporal proximity. *St. Jude*, 823 F. Supp. at 746.  Temporal proximity alone may be sufficient to infer causation where there is a small gap of time, usually less than six months, between the protected activity and the adverse action.  *Mickey v. Zeider Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008); *Parnell v. West*, No. 95-2131, 1997 U.S. App. LEXIS 12023 (6th Cir. May 21, 1997) (per curiam) (collecting cases in footnote one).  Where the period of time between the two incidents is three months or less, that evidence of temporal proximity is highly suggestive of retaliation. *See, e.g., Goller v. Ohio Dept. of Rehab. &  Corr.*, 285 Fed. Appx. 250, 257 (6th Cir. 2008) (gap of two months between complaints and discharge sufficient); *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004) (three month gap between protected activity and discharge sufficient to establish causation).

Where, however, "some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish

causality." *Mickey*, 516 F.3d at 525; *see also Tuttle*, 474 F.3d at 321 (In general, "[t]he law is clear that temporal proximity, standing alone, is insufficient to establish a causal connection for a retaliation claim."); *Martin v. GE*, 187 Fed. App'x 553, 561 (6th Cir. 2006) (an eleven month interval between the filing of an EEOC complaint and an adverse employment action was not short enough, by itself, to establish a causal connection); *McDaniel v. Potter*, Nos. 1:06 CV 0803, 1:06 CV 1371, 2007 U.S. Dist. LEXIS 79573, at *58 (N.D. Ohio Oct. 26, 2007) (a termination occurring eight months after the protected activity was too remote in time, standing alone, to create an inference of retaliation). Additional evidence of retaliatory conduct that may suffice includes but is not limited to evidence that the plaintiff faced higher disciplinary scrutiny than similarly situated employees, or that the plaintiff faced higher scrutiny than she faced before engaging in the protected activity. *See McBroom v. Barnes & Noble Booksellers, Inc.*, 747 F. Supp. 2d 906, 919 (N.D. Ohio 2010) (citing *Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 364-65 (6th Cir. 2001); *Cantrell v. Nissan N. Am. Inc.*, 145 Fed. App'x 99, 106-07 (6th Cir. 2005)). However, "'evidence that the employer had been concerned about a problem before the employee engaged in protected activity undercuts the significance of the temporal proximity.'" *Sosby v. Miller Brewing Co.*, 415 F. Supp. 2d 809, 822 (S.D. Ohio 2005) (quoting *Smith v. Allen Health Sys.*, 302 F.3d 827, 834 (8th Cir. 2002)).

Here, the evidence, if believed, would support an inference that the actions of Dugan taken subsequent to Plaintiff's report of harassment were retaliatory and designed to build a case against Plaintiff to support her eventual termination. *See McBroom*, 747 F. Supp. 2d at 921. First, on or about July 30, 2009, just two weeks after

Plaintiff reported the harassment, Dugan approached Stoute about taking formal action against Plaintiff. Although Defendant contends that Dugan and Morgan had discussed taking formal action against Plaintiff prior to her report of harassment, there is no documentation to support that contention; rather, the supporting evidence is in the form of Morgan's testimony, which is subject to a credibility determination that cannot be made on summary judgment.

The August 13, 2009 FCR occurred approximately one month after Plaintiff officially reported the harassment by Dr. X to Dugan, which is within the permissible timeframe for inferring causation based on temporal proximity. Bolstering that inference is evidence that, if believed, could suggest a retaliatory motive. Dugan testified that prior to formally putting Plaintiff on a Warning Letter, he wanted to conduct the August 2009 FCR for the purpose of showing consistent negative performance by Plaintiff, which suggests that insufficient evidence existed prior to Plaintiff's report of harassment. On that FCR, Dugan rated Plaintiff as Needs Development in four competencies: Engagement, Gaining Commitment, Resource Planning/Utilization and Prod./Comp./Mkt. Knowledge. Although Plaintiff had received Needs Development ratings in Engagement and Gaining Commitment on prior FCRs and in Resource Planning/Utilization and Prod./Comp./Mkt. Knowledge on her FY2009 annual review, the August 2009 FCR contained more Needs Development ratings than she had ever before received on a single FCR. Moreover, for the first time ever, Dugan escalated that FCR to Morgan before he gave it to Plaintiff. Although Defendant contends that the evidence shows that Defendant had legitimate concerns about Plaintiff's performance prior to reporting harassment, such evidence, as construed in Plaintiff's favor, suggests

that she received increased scrutiny and discipline following her report of harassment. *Lamer v. Metaldyne Co.*, 240 Fed. App'x 22, 30 (6th Cir. 2007) (evidence that plaintiff's adverse action occurred within a few months of his protected activity, he was not disciplined for other work-related behaviors until after he engaged in protected activity, and he was warned not to involve himself in a peer review process was sufficient to show a causal connection); *Cantrell v. Nissan N. Am. Inc.*, 145 Fed. App'x 99, 106 (6th Cir. 2005) (evidence that employer tolerated the employee's inability to get along with her co-workers for years, and did not discipline him until after the employee had engaged in protected activity, supported an inference of retaliation); *Reitz v. City of Mt. Juliet*, No. 3:08-cv-0728, 2009 U.S. Dist. LEXIS 118170, at *27 (M.D. Tenn. Dec. 18, 2009) ("[E]ven if [the employee] was consistently tardy throughout her tenure at the City, she has presented evidence that she was regularly reprimanded and fired for it only after she filed her complaint."). Therefore, taken as a whole, that evidence creates genuine issues of material fact as to whether the August 2009 FCR arose out of an effort to retaliate against Plaintiff rather than out of legitimate concerns regarding her job performance. *McBroom*, 747 F. Supp. 2d at 919-20 (citing *Brooks v. Maryland*, No. WMN-07-CV-3224, 2010 U.S. Dist. LEXIS 39447, at *25-*26 (D. Md. Apr. 20, 2010); *EEOC v. Air Liquide USA, LLC*, 692 F. Supp. 2d 658, 671 (S.D. Tex. 2010)).

The same is true for the Warning Letter. As mentioned above, Dugan initiated the suggestion for putting her on a Warning Letter just two weeks after her report of harassment. The official Warning Letter was issued to Plaintiff on September 24, 2009, or approximately two months after her report of harassment. The temporal proximity alone is sufficient to infer causation. The fact that the Warning Letter also was the first

31

formal discipline Plaintiff had received while working for Defendant suggests that Plaintiff was treated more harshly after her protected activity than before.   That evidence combined with the other evidence relating to the August 2009 FCR is sufficient to raise an inference of causation.

As for the Final Warning Letter, it was issued on January 14, 2010, approximately six months after Plaintiff's report of harassment.  Although the temporal proximity alone may be insufficient to support an inference of causation, the prior actions of Defendant, including the July 30, 2009 request to initiate formal action, the August 2009 FCR and the Warning Letter, are sufficient additional evidence of retaliatory conduct to raise an inference of causation at this stage of the litigation. Nevertheless, other evidence, if believed, further supports a finding of causality. Specifically, in the Warning Letter, Dugan did not set forth any specific criteria that Plaintiff could use to determine when and if she performed at a level sufficient to earn higher ratings or be taken off the Warning Letter.   Instead, while she was on the Warning Letter, Plaintiff was subjected to subjective FCRs and Warning Letter Updates that were administered solely by Dugan.   On those evaluations, Dugan gave Plaintiff mostly Not Progressing ratings as well as a few Learning-Developing ratings.  Not once did Dugan give Plaintiff a rating of Proficient or higher, and not once did Dugan determine that Plaintiff had sustained improvement in any core competency or any subcategory of any core competency.   Further, on the FCRs that Dugan conducted during this timeframe, Plaintiff was rated on five to nine areas per FCR whereas prior to her harassment report she was rated on only three or four areas per FCR.

Likewise, Plaintiff's termination, which occurred approximately nine months after her report of harassment, is sufficiently supported by the additional evidence of retaliatory conduct set forth above. That evidence, construed in favor of Plaintiff, could support the inference that the delay in terminating her after her harassment report resulted from Dugan's concerted effort to build a case against her to support the termination rather than from fair and legitimate actions designed to give Plaintiff a meaningful opportunity to improve any perceived deficiencies in her performance.

Accordingly, Plaintiff has set forth sufficient evidence at this stage of the litigation to satisfy the causation element of her *prima facie* case.

### C.    Pretext

As Plaintiff has satisfied her burden of proving a *prima facie* case of retaliation, Defendant must articulate a legitimate, non-discriminatory reasons for its actions. Here, Defendant's proffered reasons are that Plaintiff had a well-documented history of performance deficiencies and was unable to demonstrate sustained improvement despite Defendant's best efforts to assist her in the Warning Letter process. Continued poor work performance has been found to be a legitimate, non-discriminatory reason for termination. *Weller v. Titanium Metals Corp.*, 361 F. Supp.2d 712, 719 (S.D. Ohio 2005) ("Defendants here have articulated a legitimate, nondiscriminatory reason for Plaintiff's discharge – 'continued poor work performance' as evidenced by his latest evaluations by Defendant . . . ."). Accordingly, Defendant has satisfied its burden and Plaintiff must now show that Defendant's articulated reason for its actions is a pretext for discrimination.

The Sixth Circuit has explained that a plaintiff must allege more than a dispute over the facts upon which his discharge was based. *Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001). Instead, a plaintiff must put forth evidence which demonstrates that the employer did not "honestly believe" in the proffered non-discriminatory reason for its adverse employment actions. *Id.* In order to determine whether the defendant had an "honest belief," a court must consider whether the employer can establish its "reasonable reliance" on the particularized facts that were before it at the time the decision was made. *Id.* In *Smith v. Chrysler*, the Sixth Circuit noted:

> In deciding whether an employer reasonably relied on the particularized facts then before it, we do not require that the decisional process used by the employer be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action.

55 F.3d 799, 807 (6th Cir. 1998). This Court must not second guess the business judgment of the employer, but simply evaluate "whether the employer gave an honest explanation of its behavior." *Hedrick v. W. Res. Care Sys.*, 355 F.3d 444, 462 (6th Cir. 2004).

Plaintiff may show a lack of "honest belief" in the proffered non-discriminatory reason in three ways. First, she can show that the proffered reason had no basis in fact. To do so, she must produce evidence to show that the reasons given by the employer simply did not happen. *Weller*, 361 F. Supp. 2d at 720-21. Second, she can show that the proffered reason was insufficient to motivate the adverse action. *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). Generally, to establish the insufficiency of the proffered reasons, Plaintiff must show that "other

employees, particularly employees not in the protected class, were not subject to the same adverse actions even though they were engaged in substantially identical conduct to that which the employer contends motivated its" actions towards the plaintiff.  *Id.*  Third, she can adduce evidence that shows the proffered reason did not actually motivate the adverse action.  *Id.*  When a plaintiff attempts to prove pretext in this manner, the plaintiff

> admits tthe factual basis underlying the employer's proffered explanation and further admits that such conduct *could* motivate dismissal. The plaintiff's attack on the credibility of the proffered explanation is, instead, an indirect one. In such cases, the plaintiff attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was *more* likely than that offered by the defendant.  In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it "more likely than not" that the employer's explanation is a pretext, or coverup.

*Id.*

Regardless of which option is chosen, Plaintiff must produce "'sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants intentionally'" retaliated against her.  *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003) (alteration in original) (quoting *Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir. 2001); *see also Imwalle v. Reliance Med. Prods.*, 515 F.3d 531, 545 (6th Cir. 2008).  As "an employer's true motivations are particularly difficult to ascertain" from the paper record, retaliation claims are often "unsuitable for disposition at the summary judgment stage" once the plaintiff has made out a *prima facie* case.  *Singfield*, 389 F.3d at 564.

Here, the parties set forth various arguments as to why there is or is not pretext in this case.  With respect to the first manner in which Plaintiff may prove pretext, the

35

Court finds that Plaintiff has not set forth sufficient evidence to show Defendant's proffered reasons lacked a basis in fact.  She does not dispute that she received the FCRs, the Warning Letter or the Final Warning Letter upon which her termination was based.  Nor does she dispute that any of the observations recorded about her performance in the FCRs, Warning Letter or Final Warning Letter did not occur.  Rather, she argues that those various evaluations did not fully reflect her performance.  That argument, however, does not negate the fact that she received negative performance evaluations based on actual incidents that transpired and were observed.  As such, she has not demonstrated that the evaluations, warnings or ultimate termination lacked a basis in fact.

Likewise, Plaintiff has failed to demonstrate that her actions were insufficient to motivate the adverse actions taken by Defendant.  As explained with respect to causation, she has not set forth any documentation or specific testimony that demonstrates that other co-workers who performed similar to her in regards to both sales and competencies did not receive ratings similar to Plaintiff's ratings, did not receive a Warning Letter or a Final Warning Letter, or were not terminated.  She also has not set forth documentation or specific testimony that others who received similar evaluations on FCRs did not receive formal discipline, or that others who performed in a similar manner to Plaintiff as to competencies were taken off formal discipline or were not terminated.  Nor has she presented evidence that she was the only person ever subjected to formal discipline, or any other evidence from which it could be inferred that she was treated differently than similarly situated co-workers.  As such, she has not met her burden of proving pretext on this basis.

As for the third method of proving pretext, the Court finds that Plaintiff has met her burden.  As an initial matter, the ratings that Defendant used to evaluate Plaintiff were based on the subjective judgments of Dugan as to Plaintiff's performance.  With respect to subjective evaluations, the Sixth Circuit has recognized that "subjective evaluation processes intended to recognize merit provide ready mechanisms for discrimination[,]" but they "are not illegal per se[.]"  *Grano v. Department of Development of City of Columbus*, 699 F.2d 836, 837 (6th Cir. 1983).  Instead, the "'ultimate issue in each case is whether the subjective criteria were used to disguise'" retaliatory action.  *Id.*; *see also Gehrlein v. Horizon Sci. Acad. - Denison Middle Sch., Inc.*, No. 1:08-cv-1581, 2009 U.S. Dist. LEXIS 106849 at *12-13 (N.D. Ohio Nov. 16, 2009) (evaluating whether subjective criteria used to not renew an employment contract was a disguise for discrimination).[3]  Here, although there is no dispute that the observations recorded by Dugan after Plaintiff's report of harassment actually occurred, the evidence construed in favor of Plaintiff raises sufficient questions as to whether such observations would have been recorded or evaluated as harshly so as to result in formal discipline and termination if Plaintiff had not reported the harassment.

The primary evidence that raises questions as to Defendant's true motives is set forth above with respect to causation.  Namely, it includes (1) evidence as to the timing of the events that began to occur within weeks after Plaintiff's report of harassment; (2) Dugan's testimony that he wanted to conduct the August 2009 FCR to obtain sufficient documentation of Plaintiff's performance deficiencies prior to issuing a Warning Letter, which suggests sufficient evidence did not exist prior to Plaintiff's harassment report; (3)

---

[3] While the majority of the caselaw discussion around subjective evaluations has centered around discrimination, the Court finds that the concerns expressed are equally relevant in a retaliation case.

evidence that Dugan gave Plaintiff more Needs Development ratings on the August 2009 FCR than she had ever before received on a single FCR; (4) evidence that Plaintiff never received a single rating of or comparable to Meets Expectations following the August 2009 FCR; (5) evidence that the Warning Letter administered approximately two months after Plaintiff's harassment report was the first formal discipline she had ever received; (6) evidence creating genuine issues of material fact as to whether there had been discussions of putting Plaintiff on a Warning Letter prior to her harassment report;[4] (7) evidence that after the Warning Letter, she was evaluated on more competencies than ever before; (8) evidence that there was no specific criteria set up to determine if Plaintiff had demonstrated sustained improvement; and (9) evidence that Dugan found she had not "sustained improvement" in a single area while she was on her Warning Letter and Final Warning Letter.

Other evidence provides additional support to Plaintiff's pretext argument. First, the evidence as to whether Dugan supported Plaintiff's decision to report the harassment of Dr. X is conflicting and subject to determinations of credibility. On one hand, Dugan testified that he fully supported Plaintiff's decision to report the harassment and does not recall asking her "are you sure you want to do this?" On the other hand, Plaintiff has testified that Dugan did not support her decision to report the harassment of Dr. X, as evidenced by his question to her about reporting it, by his purported comment that Plaintiff would have to make up the sales lost by Dr. X, and by the failure to have

_____

[4]While Defendant's insist that Plaintiff's performance would have been judged the same regardless of her harassment report because discussions had occurred prior to her report about putting her on a Warning Letter and conducting an "intervention," the evidence to which Defendant refers is not conclusive. Indeed, as explained above, the evidence of prior discussions of a Warning Letter consists of the vague testimony from Morgan, which is subject to a finding of credibility that cannot appropriately be made on summary judgment. As for conducting an "intervention," the evidence cited by Defendant refers to an intervention as to the Cincinnati West territory generally rather than to Plaintiff specifically.

Dr. X removed from Plaintiff's call plan until January 2010 (approximately six months later).  When the evidence is construed in Plaintiff's favor, an inference arises that Dugan did not support her decision to report Dr. X's harassment.

Second, there is evidence as to Dr. X being a well-respected physician in the territory, being a large script writer, and being one of the key customers that Defendant was depending on "to drive growth" for the Cincinnati West territory.  If believed, that evidence could show that Dr. X was a physician who represented a growth opportunity for Defendant and for the Cincinnati West territory, which made Defendant's loss of Dr. X significant.

Third, Morgan's notes show a discussion of Plaintiff's harassment report occurred in the same meeting, and immediately prior to, a discussion of pushing a warning on Plaintiff.  A reasonable jury could construe the temporal proximity of the discussions to be suggestive of a retaliatory motive.

Fourth, the evidence shows that Morgan and Stoute relied on the subjective evaluations of Dugan in determining whether to discipline and terminate Plaintiff.  If the underlying subjective evaluations resulted from skewed ratings based on a retaliatory motive, then Morgan's and Stoute's approval of the discipline and termination based on the skewed ratings also reasonably could be inferred to be flawed.

Fifth, Plaintiff has presented some evidence that construed in her favor could show improvement in her performance while she was on her performance plan. Specifically, her QTD rankings can be construed to show a slight improvement in her rankings, and there is evidence she won the "Fast Start" contest awarding her for performance during the first half of 2010, even though the contest did not focus on any

specific skills.  The Court recognizes that Defendant contends that the sales rankings are not relevant, and to the extent they are, it is the YTD rankings that should be considered and those rankings generally fell below expectations.  However, it is unclear to the Court what the actual interplay between competencies and sales rankings were during the relevant time period.  Adding to the uncertainty is that both the YTD and QTD sales rankings appeared on the evaluations, and comments about those sales rankings were made on several of Plaintiff's FCRs.  Given that evidence, the Court construes the evidence in favor of Plaintiff and gives the QTD rankings some consideration when evaluating pretext.

Sixth, Plaintiff has presented some evidence that, if believed, shows that Drews, who also reported the harassment of Dr. X, was subjected to harsh criticism and negative evaluations when she was later managed by Dugan, which led her to resign from her position with Defendant.

While the Court does not find that the additional evidence presented by Plaintiff weighs strongly in favor of finding pretext standing alone, the totality of the evidence is sufficient to create genuine issues of material fact as to Defendant's honest belief in its proffered reason for its actions against Plaintiff.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, Defendant's Motion for Summary Judgment (Doc. 16) is **DENIED**.

**IT IS SO ORDERED.**

s/ Michael R. Barrett
Michael R. Barrett, Judge
United States District Court